UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-CR-1036 HEA |
| | ) | |
| LESLIE WESTFALL, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on the Report and Recommendation of Magistrate Judge John M. Bodenhausen, addressing Defendant Westfall's Motion to Suppress [Doc. No. 77]. On August 8, 2019, an evidentiary hearing was held. In his November 1, 2019 Report and Recommendation, Judge Bodenhausen recommended that the Defendant's motion be denied in part and granted in part. Defendant has filed a written objection to this recommendation. For the reasons set forth below, the Court adopts Judge Bodenhausen's recommendation.

**LEGAL STANDARD**

When a party objects to the magistrate judge's report and recommendation, the Court must conduct a *de novo* review of the portions of the report, findings, or recommendations to which the party objected. See *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (citing 28 U.S.C. § 636(b)(1)(A)). Where it has been

shown that the magistrate judge's order is clearly erroneous or contrary to law, the Court may reconsider the matter. 28 U.S.C. §636(b)(1)(A). Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court reviews the findings of the magistrate *de novo*. The Court has reviewed the entire record for this purpose.

## FACTS AND BACKGROUND

In his Report and Recommendation, Judge Bodenhausen found that gun and drug evidence seized should not be suppressed because the police had reasonable suspicion to stop and frisk Defendant when they encountered him outside 1431 Wishert Place on October 4, 2018. Judge Bodenhausen also found that none of Defendant's statements to Officer Njeri should be suppressed because those statements were spontaneous and not made in response to any police interrogation or the functional equivalent of interrogation. Finally, Judge Bodenhausen found that Defendant's statements to Officer Voss regarding his gun possession should be suppressed but that all other statements to Officer Voss should not be suppressed.

Defendant objects generally to the Report and Recommendation, relying on the arguments set forth in his original motion to suppress and supplemental memorandum in support of the motion to suppress. Defendant argues that officers had no reasonable suspicion to stop him, that officers had no probable cause to arrest him and perform a search incident to arrest, and that his statements to Officers Njeri and Voss were made in response to the functional equivalent of

questioning before he had been read his *Miranda* rights. Defendant does not dispute the facts and hearing testimony as detailed in Judge Bodenhausen's Report and Recommendation. The relevant facts are briefly summarized as follows:

On December 12, 2018, the Grand Jury charged Defendant with: conspiracy to distribute marijuana, in violation of 21 U.S.C. § 846 (Count One); possession with the intent to distribute marijuana, in violation of 21 U.S.C. § 841 (Count Two); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three); and possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. 922(g) (Counts Five and Six).

The charges stem from the events that occurred on October 4, 2018 in the 1400 block of Wishart Place in St. Louis County, Missouri. St. Louis County police officers were conducting undercover surveillance in the area as a result of anonymous citizen complaints about drug-related activity. Police officers Brown and Dooley were observing 1431 Wishart Place from an unmarked car and reporting their observations to other officers over police radio.

During the surveillance, Officer Brown observed the following. A black Cadillac STS with heavily-tinted windows circled the area and eventually stopped in front of 1431 Wishart Place. Then, a tan Ford Explorer pulled up next to the Cadillac. The driver of the Cadillac appeared to exchange something with the front seat passenger of the Ford. After the exchange, the Ford departed the area.

Brown testified that based on his training and experience, he suspected that the Cadillac and the Ford had engaged in a hand-to-hand drug transaction because the exchange appeared to be more than a handshake, although he could not see what was exchanged, and because the Ford and the Cadillac were positioned for a quick get-away. At the same time, there were several other people standing in front of 1431 Wishart Place, with some people looking up and down the street. Brown testified that when an unidentified male looked up the block toward Officer Brown's unmarked vehicle, two males began walking from 1431 Wishart Place toward the unmarked vehicle containing Officers Brown and Dooley, with one man approaching each side of the vehicle. The person approaching the passenger side aggressively asked, "What the f**k you all doing around here?" Brown, concerned about the men's confrontational manner and point of advantage, drove away, at which point marked and unmarked police vehicles entered the area.

Officer Roy Njeri performed a back-up role in the October 4, 2018 surveillance and was one of the nearby officers monitoring Brown and Dooley's radio communications. Aware of the suspected hand-to-hand drug transaction and the potential danger facing Officers Brown and Dooley, Njeri and another officer entered Wishart Place in a marked police vehicle from the south side. Njeri then observed two people exiting the black Cadillac in front of 1431 Wishart Place "in haste" and approaching the residence. Njeri approached the passenger, who was

later identified as Defendant Leslie Westfall, while the other officer approached the driver (later identified as co-defendant Dante Campbell.) Njeri identified himself as a police officer and instructed Westfall to stop. Njeri thought Westfall seemed hesitant, which lead Njeri to suspect that Westfall was thinking about fleeing. Westfall then turned toward Njeri. As Westfall turned, Njeri saw the butt of gun hanging out of one of Westfall's front pants pockets. Njeri drew his own gun and ordered Westfall to raise his hands. Westfall complied. Njeri handcuffed Westfall and retrieved the gun from Westfall's pocket. The gun was loaded with 16 bullets. Westfall told Njeri that Njeri was lucky he drew his gun first because Westfall might have otherwise shot Njeri. Westfall physically complied with Njeri while also yelling and cursing at the police. While Westfall was physically secured, the police conducted an inquiry and learned that he had a prior felony conviction. Westfall was then formally arrested. Njeri also recovered marijuana and pills that were later determined to contain Xanax from Westfall's pants. (It is unclear whether those items were recovered when Njeri recovered the gun or after Westfall's arrest.) Njeri testified that Westfall stated that the suspected drugs were not his. Njeri transported Westfall to the police station, during which Westfall's demeanor was "up and down." According to Njeri, Westfall repeated during transport that Njeri was lucky that he had his gun drawn and told Njeri that he kept a gun for protection. Njeri testified that he never questioned Westfall and never

read him any Miranda warnings.  Njeri testified that he might have thanked Westfall for not shooting him, but clarified that if he did, it was in response to Westfall's statement that Njeri was lucky that Westfall did not shoot him.

Officer Trevor Voss was the officer in charge of the teams conducting surveillance in the area of the 1400 block of Wishart Place on October 4, 2018. Voss also monitored the activity on Wishart Place via a police radio. When Voss arrived on the scene, Njeri was already addressing Westfall.  After Westfall was arrested and placed in a police vehicle, Voss "could hear him yelling from outside the police car."  Voss testified that, "I know what it's like to transport people that are combative or loud or aggressive, so I got him out of the car. I put my hand on his shoulder and told him I appreciated the fact that they didn't shoot at us when we arrived."  In explaining these actions, Voss testified that there had been many people at the scene prior to the arrest and that yelling at a scene could attract other people, affecting officer safety and the investigation.  Voss testified that Westfall calmed down after Voss spoke to him.  Voss testified that Westfall then made the following statements: that he had the gun "for his own protection;" that his father had recently committed suicide; and, that his landscaping truck had broken down, so he was selling marijuana as a "stopgap until he could get [the] landscape business up and running."  Voss testified that during this time, he did not say anything other than thanking or nodding at Westfall.  Voss thanked Westfall again

6

and placed him back in the police car. Voss did not provide any Miranda warnings to Westfall prior to speaking to him. Voss testified that he did not intend to ask Westfall any questions or elicit a verbal response, but was trying to achieve a behavioral response from Westfall, namely to calm him down. After his arrest and transport to a jail, Westfall was provided Miranda warnings but declined to make any statement to the police.

Judge Bodenhausen credited the testimony of Officers Brown, Njeri, and Voss. As noted above, the facts are not in contention here, and Judge Bodenhausen's findings of fact are accepted.

## DISCUSSION

I.  Officer Njeri's Stop of Defendant Westfall

Defendant argues that Officer Njeri did not have reasonable suspicion to initially stop and detain him. Judge Bodenhausen set out the well-settled law regarding such *Terry* stops by law enforcement:

> Police officers may briefly detain an individual for an investigative purpose when they have a reasonable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). *See also United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015). "The concept of reasonable suspicion is not 'readily, or even usefully, reduced to a neat set of legal rules.'" *United States v. Quinn*, 812 F.3d 694, 697 (8th Cir. 2016) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "Reasonable suspicion must be supported by more than a 'mere hunch,' but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard.'" *Roberts*, 787 F.3d at 1209 (quoting *United States v. Arvizu*, 534 U.S. 266, 274

7

(2002)). A reviewing court considers the totality of the circumstances. *See id.* In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotations and citation omitted). The Court may also consider "[s]ituational factors including the time of day or night and the location of the suspect parties." *Roberts*, 787 F.3d at 1209 (internal quotations and citations omitted). "[E]ven 'a series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together.'" *United States v. Gonzalez*, 781 F.3d 422, 428 (8th Cir.) (quoting *United States v. Weaver*, 966 F.2d 391, 394 (8th Cir. 1992)), *cert. denied*, 136 S. Ct. 139 (2015). *See also Quinn*, 812 F.3d at 698 (explaining that totality of the circumstances standard precludes courts from engaging in a "divide-and-conquer" analysis of each factor separately) (citing cases).

"In deciding whether there is reasonable suspicion, an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation." *United States v. Guzman*, 926 F.3d 991, 997 (8th Cir. 2019) (citations and internal quotations omitted). This is sometimes referred to as the "collective knowledge" rule. In applying the collective knowledge rule, there must be some degree of communication between the officers. *See United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (citation omitted).

Defendant argues that Njeri did not have reasonable cause to stop him because Defendant was not part of the exchange between the driver of the Cadillac and the passenger of the Ford that was observed by Officer Brown, Defendant was not one of the men who approached Brown's unmarked vehicle, and Njeri had not yet seen the butt of a gun in Defendant's pocket when he stopped Defendant. In short, Defendant argues that "[e]ven if the officers had grounds for reasonable

8

suspicion that a crime had been committed, they had no reasonable suspicion that Mr. Westfall was involved in any crime."

Here, the collective knowledge doctrine applies to Brown's observations, which were communicated in real time to the back-up officers including Njeri via police radio. As such, the information available to Njeri included: anonymous complaints about drug activity; an exchange between the passenger in the Ford and the driver of the Cadillac in which Defendant was a passenger; the presence of several people standing around outside the residence, looking up and down the street, and aggressively approaching officers in an unmarked car; and, Defendant and Campbell hastily exiting the Cadillac and heading toward the residence when marked and unmarked police cars entered Wishart Place. Also relevant here are Officers Brown's and Njeri's experience and training in drug investigations, including investigations involving open-air drug activity. Based on the totality of the circumstances listed above, the Court finds that Njeri had reasonable suspicion to believe that illegal activity was taking place, namely a drug transaction involving the Cadillac and the people outside 1431 Wishart Place. Defendant's contention that no reasonable suspicion existed because Brown could not see what, if anything, was being exchanged is unpersuasive, as Brown and Njeri could reasonably infer from the circumstances and their training in drug transactions that criminal activity was afoot. Moreover, Defendant's contention that no reasonable

9

suspicion could have existed because Brown saw the driver, not the passenger, of the Cadillac make an exchange is not persuasive. As Judge Bodenhausen noted, the Cadillac had heavily tinted windows, meaning the scope of Defendant's involvement in the drug transaction, if any, was unknown to Brown and, by extension, Njeri. Based on all the surrounding circumstances, it was reasonable for Njeri to suspect that Defendant was somehow involved in illegal activity. Njeri's stop of Defendant was supported by reasonable suspicion. Defendant's objection will be overruled with respect to the stop.

II. Officer Njeri's Pat-Down of Defendant Westfall

Defendant argues that the fruit of Njeri's search of Defendant's person, namely the gun, marijuana, and pills, should be suppressed because the police lacked probable cause to conduct a warrantless arrest and search incident thereto. In response, the government argues that the pat-down search was a proper part of the *Terry* stop and reasonably necessary to protect officer safety considering the gun in plain view in Defendant's pants pocket.

Judge Bodenhausen appropriately evaluated the stop and pat-down under the *Terry* and its progeny. First, he noted that "[r]easonable suspicion for a *Terry* stop does not by itself always justify an accompanying pat-down search." He went on to outline the relevant law and apply it to this case:

> Rather, "[o]fficers may conduct a protective pat-down search for weapons during a valid stop—whether a traffic stop or an

investigative Terry stop or a consensual stop— when they have objectively reasonable suspicion that a person with whom they are dealing 'might be armed and presently dangerous and criminal activity might be afoot.'" *United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011) (quoting *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000)). In Westfall's case, Officer Njeri observed the butt of a handgun on the person of a suspected drug dealer. Thus, an objectively reasonable suspicion supports his decision to secure Westfall's person and search him for weapons. *See United States v. Pope*, 910 F.3d 413, 417 (8th Cir. 2018) (citing *United States v. Sanders*, 994 F.2d 200, 209 (5th Cir. 1993)), *cert. denied*, 219 WL 4921548 (Oct. 7, 2019).

Judge Bodenhausen correctly analyzed the issues. After Njeri told him to stop, Defendant hesitated, then turned to face Njeri. At this point, as discussed above, Njeri had an objectively reasonable suspicion that Defendant might be engaged in criminal activity. As Defendant turned, Njeri saw the butt of a gun sticking out of Defendant's pocket in plain view. Upon seeing the gun in Defendant's pocket, Njeri had an objectively reasonable suspicion that Defendant was armed and dangerous. Therefore, Njeri could lawfully secure Defendant and conduct a protective pat-down search for weapons.

As Judge Bodenhausen noted in his Report and Recommendation, it is unclear whether Njeri found the marijuana and pills on Defendant's person during the pat-down or after Defendant's arrest. In either case, the search and seizure of the drugs were legal. As Judge Bodenhausen noted, if Njeri found the drugs during the pat-down, they are admissible under the plain feel doctrine:

> In any event, having seen Westfall in possession of a firearm, Officer Njeri could lawfully frisk Westfall prior to arresting him. Thus, under the "plain touch" or "plain feel" rule, *see Minnesota v. Dickerson*, 508 U.S. 366 (1993), even if Officer Njeri frisked Westfall before he learned of Westfall's prior felony conviction, any drugs he seized from Westfall's pockets would not need to be suppressed as the fruit of an unlawful frisk. *See United States v. Cowen*, 674 F.3d 947, 953 (8th Cir. 2012) (internal quotations omitted) (citing *Dickerson*, 508 U.S. at 375; *United States v. Bustos-Torres*, 396 F.3d 935, 944 (8th Cir. 2005)).

On the other hand, if Njeri found the drugs during the search incident to Defendant's arrest, they are admissible because the arrest complied with the Fourth Amendment, as discussed in detail below.

Njeri had reasonable suspicion to stop Defendant and Defendant was armed in plain view, necessitating the protective pat-down of Defendant's person. Defendant's objection is overruled with respect to the pat-down.

### III. Defendant's Arrest

Defendant contends that the search of his pockets was a search incident to arrest. He argues that the search was not legal because Defendant's arrest was not constitutionally valid; specifically, Defendant argues that the police officers had no probable cause to arrest him. In support of this contention, Defendant argues that anonymous tips, without more, are insufficient for probable cause, that "there is nothing criminal about passing objects between people," that "there are just as many non-criminal explanations for speaking with a group of people in a yard," and that at the moment the arrest was made, Njeri "had no reason to believe

[Defendant] was a felon" and thus no reason to believe that Defendant's possession of a firearm was unlawful.

Defendant ignores the undisputed fact that he was arrested after the police officers ran a computer search incident to the investigatory stop which revealed that he was a felon, giving Njeri probable cause to believe that Defendant committed the crime of possession of a firearm by a felon. The other factors mentioned by Defendant are not relevant to the probable cause determination because Defendant's the investigative stop of Defendant was properly supported by reasonable suspicion, as discussed above.

Accordingly, Defendant's arrest was supported by probable cause, and any search incident to arrest did not violate his Fourth Amendment rights. Judge Bodenhausen correctly reached the same conclusion. Defendant's objection is overruled as to the arrest.

### IV. Defendant's Custodial Statements

After his arrest and while in custody, Defendant made statements to Officer Njeri and Officer Voss. Judge Bodenhausen recommended that Defendant's statements to Voss regarding his firearm should be suppressed because Voss' comment thanking Defendant for not shooting at the police was reasonably likely to elicit incriminating statements from Defendant about the firearm, even if it was not Voss' intention to do so. Because Judge Bodenhausen's Report and

13

Recommendation suggesting this part of Defendant's Motion to Suppress should be granted is well-reasoned, the Court adopts it.

On the other hand, Judge Bodenhausen recommended that all other statements made by Defendant were spontaneous and not the result of interrogation or the functional equivalent thereof and should not be suppressed. Judge Bodenhausen set out the relevant law regarding custodial statements:

> Statements made to law enforcement officers during custodial interrogation are normally subject to the protections and procedures identified in *Miranda v. Arizona*, 384 U.S. 436, 477-78 (1966). *See United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody …." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (citation and quotation omitted). Miranda warnings are required when a suspect is both in custody and subjected to official questioning. *See LeBrun*, 363 F.3d at 720. Even if a suspect is in custody, however, a suspect's spontaneous statements which are not made in response to interrogation are not subject to *Miranda*. *See United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016) (citation omitted).
>
> Police interrogation can take forms other than express questioning. Rather, "properly understood, [interrogation] involves either 'express questioning or its functional equivalent.'" *United States v. Wipf*, 397 F.3d 677, 685 (8th Cir. 2005) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). "Accordingly, interrogation encompasses 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Innis*, 446 U.S. at 301). "But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301-02 (emphasis in original, footnote omitted).

> Determining "[w]hether a particular statement constitutes an interrogation depends upon the circumstances of each case …." *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005).

Defendant's argument supporting suppression of his statements to both Voss and Njeri is that "Officer Voss and Office Njeri's statements thanking Mr. Westfall for not shooting at police were the 'functional equivalent' of express questioning under *Innis* because the officers should have known that these statements were reasonably likely to illicit a response from Mr. Westfall, who they had identified as a convicted felon, about his possession of a firearm." As discussed above, Judge Bodenhausen agreed with respect to Defendant's statements to Voss regarding the firearm.

Judge Bodenhausen correctly concluded that Defendant's other, non-firearm related statements to Voss should not be suppressed because Voss could not reasonably foresee that Defendant would bring up his marijuana sales, father's suicide, or truck problems in response to Voss thanking Defendant for not shooting him. Also correct was Judge Bodenhausen's conclusion that because Njeri only thanked Defendant for not shooting *after* Defendant made his spontaneous statement that Njeri should be lucky that he drew his gun first, that statement was not made in response to functional interrogation and should not be suppressed.

All of Defendant's statements to Njeri, and his non-firearm related statements to Voss, were spontaneous and not related to any statements that the

police officers made to Defendant. Defendant's objection is overruled with respect to his statements that were not made to Voss *and* related to the firearm.

**Conclusion**

Judge Bodenhausen's conclusions that the gun and drug evidence seized during from Defendant should not be suppressed, that none of Defendant's statements to Officer Njeri should be suppressed, and that Defendant's statements to Officer Voss regarding his gun possession should be suppressed but that all other statements to Officer Voss should not be suppressed are based on sound legal analysis. The Court agrees with his conclusions in their entirety. The Recommendation is adopted *in toto*.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress, [Doc. No. 77], is **GRANTED** as to any statements Westfall made to Officer Voss concerning a firearm and **DENIED** in all other respects.

Dated this 18th day of December, 2019.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE